### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| United States of America, | : CIVIL ACTION |
| | : |
| | : 05-cv-823 |
| | : 96-cr-407-1 |
| v. | : |
| | : |
| Byron Mitchell | : |

### MEMORANDUM AND ORDER

**Joyner, J.**                                            **May 21, 2007**

Presently before the Court is Byron Mitchell's ("Petitioner" or "Mitchell") Motion for *Habeas Corpus* pursuant to 28 U.S.C. § 2255 ("Section 2255") (Doc. No. 202), and the Government's Opposition (Doc. No. 204). For the reasons below, the Court **DENIES** Mitchell's motion.

### I. Background[1]

*A. Introduction*

On February 7, 2000, a jury in the Eastern District of Pennsylvania convicted Mitchell of one substantive count of Hobbs Act robbery and one count of conspiracy to commit Hobbs Act robbery, both in violation of 18 U.S.C. § 1951; and one count of use or carrying of a firearm during a crime of violence, in

---

[1]  The Court forewarns the reader that this background section is of a somewhat abbreviated nature.  This is so, despite the case's undeniably rich and interesting history, because most of it is simply not relevant to the narrow issues raised by Mitchell's current petition for *habeas corpus*.  For an exhaustive summary of this case, the interested reader is directed to the Third Circuit's opinion affirming his February 2000 conviction.  See United States v. Mitchell, 365 F.3d 215, 219-233 (3d Cir. 2004) (Becker, J.).

violation of 18 U.S.C. § 924(c).  After denying Mitchell's post-trial motion for a new trial,[2] this Court imposed a sentence of 288 months imprisonment, three years of supervised release, restitution in the amount of $19,100, and a special assessment fee of $150.  The Third Circuit affirmed the conviction, and the Supreme Court subsequently denied the petition for _certiorari_. See United States v. Mitchell, 365 F.3d 215 (Becker, J.), _cert. denied_, 125 S. Ct. 446 (2004).

This was the second time the Government had tried Mitchell for these offenses.  The Third Circuit had previously concluded that this Court erred by admitting into evidence inadmissible hearsay[3] that was not subject to any of the exceptions provided by Fed. R. Evid. 803 during Mitchell's first trial in 1997. See United States v. Mitchell, 145 F.3d 572, 576-79 (3d Cir. 1998) (Sloviter, J.).  Because the other evidence linking Mitchell to the alleged offenses was in its view of a

---

[2] Mitchell moved for a new trial pursuant to Fed. R. Civ. P. 33 claiming that the Government violated its obligations under _Brady v. Maryland_, 373 U.S. 83 (1963), by failing to disclose a solicitation for fingerprint validation studies.  The Court denied his motion and this ruling was affirmed on appeal. See United States v. Mitchell, 199 F. Supp. 2d 262 (E.D. Pa. 2002), _aff'd_, 365 F.3d at 254-57.

[3] This inadmissible hearsay was in the form of an anonymous note left in one of the cars involved in the robbery identifying that the robbers had switched to a light green car with license plate ZPJ-254. See Mitchell, 365 F.3d at 220.  There was no testimony about this note or its contents at the second trial.

limited nature, the Court of Appeals concluded that this error was not harmless, vacated his conviction, and remanded for a new trial. See id. at 579-80.

Mitchell now contends, based primarily on statements taken from Judge Becker's opinion for the Third Circuit in the second appeal, that his trial counsel[4] were ineffective for failing to call certain experts who would testify as to the reliability (or lack thereof) of fingerprint identification. See Motion for *Habeas Corpus* ("Petition") at 5.  He therefore asks this Court to vacate his conviction and grant him a new trial.

*B. The Offense*[5]

On the morning of September 12, 1991, "two men with handguns robbed an armored car employee of approximately $20,000 as he entered a check cashing agency at 29th Street and Girard Avenue in North Philadelphia." Mitchell, 365 F.3d at 220.  The robbers then fled in a beige car driven by a third person while simultaneously engaging in gunfire with the armored truck

---

[4]  Mitchell was represented by Leigh Skipper, Esq. and Robert Epstein, Esq. during the second trial.  Both of these attorneys were and currently are employed in the Federal Defender Office of the Defender Association of Philadelphia.

[5]  The Court draws this summary primarily from the Third Circuit's second opinion in this case. See Mitchell, 365 F.3d at 220. With the exception of direct quotations, the Court omits (for clarity) citations in this section of the opinion.

employees.  The beige getaway car, which had been stolen approximately an hour before the robbery, was found abandoned about a mile from the agency.

The Government's theory of the case was that William Robinson (a/k/a "Bookie") and Terrence Stewart (a/k/a "T") were the robbers and that Mitchell acted as the getaway driver.  There was also a fourth participant, Kim Chester, "who knew of the plans, helped case the robbery site," and spent (at least some) of the robbery's proceeds.  Id.  Because Robinson and Stewart died before trial,[6] and Chester testified for the Government as an unindicted accomplice, Mitchell was tried alone both times.

*C. The Second Trial*[7]

Before the start of the second trial, Mitchell filed a motion to exclude the Government from presenting expert testimony on the identification of latent fingerprints found on the gear shift lever and driver's side door of the beige getaway car.  See Doc. 99 (in 96-cr-407-01); Mitchell, 365 F.3d at 320.  His main contention was that this evidence was inadmissible under Fed. R.

_____

[6]  These gentlemen had in fact died before Mitchell's first trial commenced in January 1997.

[7]  Again, this summary follows primarily from the Third Circuit's second opinion in this case.  See Mitchell, 365 F.3d at 220-32.

-4-

Evid. 702.[8]  This Court thereafter held a hearing pursuant to

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993)

("*Daubert*"), to determine whether the Government's (and

Mitchell's) proposed experts' testimony about fingerprint

identifications would be admissible.

        As part of its preparation for the *Daubert* hearing, the

Government had the FBI create a survey that was "sent out to the

principal law enforcement agency of each of the fifty states,

plus the District of Columbia, Canada's Royal Canadian Mounted

Police, and the United Kingdom's Scotland Yard." *Mitchell*, 365

F.3d at 223.  Among the items included in the survey (and most

relevant to Mitchell's current petition) was a request to see if

_____

        [8]  Fed. R. Evid. 702 governs the admissibility of expert
testimony.  It provides that "scientific, technical, or other
specialized knowledge" is admissible:

                If . . . [it] will assist the trier of fact to
                understand the evidence or to determine a fact in
                issue, a witness qualified as an expert by
                knowledge, skill, experience, training, or
                education, may testify thereto in the form of an
                opinion or otherwise, if (1) the testimony is
                based upon sufficient facts or data, (2) the
                testimony is the product of reliable principles
                and methods, and (3) the witness has applied the
                principles and methods reliably to the facts of
                the case.

        The Court notes that the current version of Fed. R. Evid. 702
differs slightly from the one that was in effect at the time of
Mitchell's second trial.  For the purposes of this opinion, however,
any differences are immaterial.

an identification could be made between Mitchell's fingerprints

and the two latent prints[9] found on the gear shift lever and

---

[9]  The Court believes that some understanding of both the processes and basic jargon associated with fingerprint identification may be beneficial for the reader.  And so what follows is a short primer about fingerprints and the methods of fingerprint comparison/identification.

Criminals don't usually leave behind full fingerprints on clean, flat surfaces.  Rather, the prints they leave behind are typically distorted (smudged) or marred by artifacts (small amounts of dirt or grease that appear to be part of the fingerprint).  Fingerprint experts refer to these types of prints as latent ("to lie hidden") because they are often not visible to the naked eye until "dusted." In contrast to latent prints is a "full" fingerprint, which is made by rolling the "full surface of the fingertip onto a fingerprint card or electronic fingerprint capture device." Mitchell, 365 F.3d at 221. These full fingerprints are referred to as "rolled" or "full-rolled" prints.  They archetypal full rolled print (as anyone familiar with Law and Order knows) is the one taken during a police booking; it's known as a "ten-print card."

Fingerprints are nothing more than an impression of the friction ridges on the fingertip (and palm) that result when oil is deposited upon contact with a surface.  A fingerprint identification (or match) therefore involves comparing the latent print's "pattern" of friction ridges with that of a known full-rolled print (such as a ten-print card).  To properly make such a comparison requires an examiner to compare several levels of detail within the friction ridges. See id. at 221 (describing that friction ridges have three levels of detail: 1, 2, and 3).  The FBI - the agency that made the primary identification in this case - uses a comparison process known as the ACE-V method, which is an acronym for "analysis, comparison, evaluation, and verification."  Reduced to layman's terms, the method basically involves stepping through the various levels of friction ridge detail to determine whether there is a match.  If an examiner concludes that there is one, it must be independently verified by another examiner. See id. at 221-22 (detailing the ACE-V method).

Finally, there are two basic standards used at the evaluation stage to determine if there is a match.  Under the $n$-point system, an examiner will confirm a match if there are a sufficient number of "points" found in common between the latent print and a known full print.  For example, an examiner might confirm that he has a 10-point match.  This means that there are 10 matching characteristics (known as "Galton points" - a Level 2 detail) between the latent print and known full print.  This system (i.e. requiring a minimum number of matching points to confirm a match) is used in a number of jurisdictions both within and outside of the United States. See id. at

driver's side door of the beige getaway car.

The *Daubert* hearing took nearly five full days to complete in July 1999.[10]  During the hearing, the Government called six witnesses (plus one rebuttal witness), and Mitchell, four.[11]  Two months later, the Court ruled from the bench and

---

222 (citing 2 Paul C. Giannelli & Edward Imwinkelried, *Scientific Evidence* § 16-7(A) at 768 (3d ed. 1999) (quote omitted)).  The FBI does not subscribe to the $n$-point system, but rather uses one that is more qualitative in nature (though still retaining some quantitative aspects).  Its system focuses on the combination of both Level 3 detail (the highest) and Level 2 detail.  Thus, the FBI may confirm a match despite a paucity of Level 2 detail (e.g., corresponding Galton points), so long as the Level 3 detail is of a very high quality.  But it may also confirm a match without reference to Level 3 detail when there is a high level of Level 2 detail.  In sum, the FBI's system does not rely upon an objective numerical standard (i.e. a minimum number of Galton points) for making a match.

[10]  Its enormity was certainly not lost upon by the Third Circuit, which commented that it had resulted in "nearly one thousand pages of testimony and a similarly voluminous array of exhibits." Mitchell, 365 F.3d at 222.

[11]  Mitchell presented testimony from three experts during the *Daubert* hearing.  These gentlemen were: Dr. David Stoney, who was qualified as an expert in forensic science, particularly with respect to the issue of fingerprint individuality; Professor James Starr, who was qualified as an expert "in forensic science qualified to provide an opinion as to whether latent fingerprint examination meets the criteria of science;" and Dr. Simon Cole, who was qualified as an expert in the "field of science and technology studies with particular expertise regarding the fingerprint profession." See 7-12-99 Daubert Tr. at 46 ln. 10-14; id. at 83-86 (Stoney); 7-12-00 Daubert Tr. at pp. 135-36, 147-48 (Starr); 7-13-99 Daubert Tr. at 8 ln. 14-16.  The Court will refer to these gentlemen collectively as the "*Daubert* experts."

(The Court uses the following format in citing from the transcripts: M-Day-Yr Tr. at [page no.] ln. [line numbers].  If multiple pages are cited without line numbers, the Court notes this by the use of 'pp.'  Unless otherwise indicated, all transcript citations are from Mitchell's second trial that began on January 31, 2000.)

denied Mitchell's motion.  His second trial began on January 31, 2000.

The Government called eleven lay witnesses and two experts in its case against Mitchell.  Chester[12] testified that she was present when Bookie and T were planning the robbery.  She implicated Mitchell in the robbery in several ways.  *First*, she testified that she was present when he was discussing plans for the robbery with T.  *Second*, she explained that the night before the robbery Mitchell, Bookie and T discussed the need for a stolen car to use in the robbery.  *Third*, Chester described an argument she observed, while getting a ride to work, between Mitchell and Bookie on the day of the robbery over using Mitchell's wife's car in the robbery (Mitchell didn't want to use it as a getaway car).[13]  Chester did not testify to having participated in the actual robbery, but said that when she next spoke to Bookie he indicated that they had gone through with it, and he had a substantial amount of cash.

Several of the lay witnesses were called to testify about

_____

[12]  The Third Circuit characterized Chester as "the government's star [lay] witness." <u>Mitchell</u>, 365 F.3d at 230.  This is a fair characterization because Chester was only person who could (and did) testify as to Mitchell's role in the robbery.

[13]  They were apparently in Mitchell's wife's car at the time of this argument.

the stolen beige getaway car.  Among these witnesses were the
car's owner, Alma Shaw, who testified to it being stolen on the
morning of the robbery; the armored car guards, who identified
Shaw's car as the getaway car; and a bystander, who noted a
fragment of the getaway car's license plate, which was consistent
with Shaw's license plate.

The Government called FBI Special Agents Kevin Mimm and
Daniel Murphy to testify about Mitchell's arrest on the day of
the robbery.  Because of a number of armored car robberies in
Philadelphia, they described that they were conducting an ongoing
surveillance operation.[14]  Agent Mimm testified that he was
engaged in covert surveillance of Mitchell (trailing him in a
car) when Mitchell suddenly took evasive maneuvers.  He then
detailed Mitchell's attempt to elude him by running through stop
signs and traveling at speeds up to 50 miles per hour before
being able to finally stop him.[15]  At the time of his arrest,
Mitchell was found to have $1400 in five and ten dollar bills on
him.  This currency was never identified as being part of the
armored truck's delivery, however.

---

[14] Agent Murphy was in charge of these operations at the time of
Mitchell's arrest.

[15] See 2-2-0 Tr. at pp. 4-18.  Agent Mimm noted that the posted
speed limit in the area was 25 miles per hour.

Finally, the Government called FBI Special Agents Steven Meagher and Wilbur Johnson.  Both were qualified as experts in the field of fingerprint identifications.[16]  Agent Meagher testified about the process of fingerprint identification[17] and about the survey that the FBI had sent in preparation for the _Daubert_ hearing.  He explained both the purpose for and results of the survey and emphasized that 31 out of 40 jurisdictions (representing 67 examiners) were able to initially match the latent prints found in the getaway car as being Mitchell's.[18]

Agent Johnson was responsible for lifting and preserving the latent prints in this case.  Accordingly, his testimony focused more on how the latent prints had been found in the beige getaway car and subsequently preserved.  Both he and Agent Meagher testified that they were able to positively and definitely match the latent prints found on the gear shift lever

---

[16] See 2-2-00 Tr. at 51 ln. 8-11 (Meagher); 2-2-00 Tr. at 213 ln. 16-19 (Johnson).

[17] This included demonstrating for the jury the FBI's ACE-V technique for matching the latent prints found in beige getaway car to Mitchell's ten-print card. See also _supra_ Note 9.

[18] Overall, 81 out of 81 examiners concluded that one of the latent prints found in the getaway car belonged to Mitchell, and 80 out of 81 examiners concluded that the other latent print from the getaway car belonged to Mitchell. See 2-2-00 Tr. at pp. 79-81; 2-3-00 Tr. at pp. 162-63; _id._ at p. 183; _id._ at p. 193; _id._ at p. 204; 2-4-00 Tr. at p. 15; _id._ at p. 26, _id._ at pp. 51-52; _id._ pp. 59-60; _id._ p. 77; _see also_ Govt. Resp. at 12-13.

and driver's side door of the beige getaway car as belonging to Mitchell.

Mitchell based his entire case[19] on challenging the Government's latent fingerprint identification.[20]  He did this in two ways.  _First_, Mitchell cross-examined Agents Meagher and Johnson extensively about fingerprint identification processes and the design of the FBI's survey.  _Second_, during his case-in-chief, Mitchell called the twelve latent fingerprint experts (representing nine different states) who had received the FBI's survey but had been initially unable to match one or both of the latent prints as belonging to him.[21]  But despite this emphasis on undermining the fingerprint evidence, Mitchell's counsel also challenged Chester's credibility and veracity on cross examination.[22]

---

[19]  The Court discusses Mitchell's case-in-chief and cross examination of the Government's witness in greater detail below. _See_ _infra_ Pt. III.

[20]  Given that nearly half of Mitchell's opening statement was devoted to the significance of the fingerprints, it was unsurprising that this was his trial strategy. _See_ 2-1-00 Tr. at pp. 31-40.

[21] The twelve experts (and their states) were: John Otis (Maine); Janice Williams and Michael McSparrin (Mississippi); Ralph Turbyfill (Arkansas); Donald Lock (Missouri); Russell McNatt, Jr. (Delaware); Raymond York (Idaho); John Artz (Nevada); Janice Reeves (Louisiana); and Edward Pelton, Robert McAuley, and James Ruszas (New York).

[22] _See, e.g.,_ 2-3-00 Tr. pp. 31-33 (highlighting that Chester lied about suffering from a cocaine or crack problem in order to enroll into mental health treatment center).

*D. Mitchell's Ineffective Assistance of Counsel Claim and the 2255 Hearing*[23]

Mitchell claims that his trial counsel was ineffective for failing to call "[his] expert witnesses at trial to testify to the reliability (or lack thereof) of fingerprint identification." Petition at 5.  He argues that this error manifested itself in two ways.  *First*, trial counsel "never offered or made any attempt" to qualify the expert witnesses he called during the *Daubert* hearing in a manner that would have made them eligible to testify at trial on the issue of reliability.  *Second*, counsel's ineffectiveness is readily apparent by their failure to inquire as to whether certain subject areas - namely the reliability of fingerprint identification - was a permissible topic on which a qualified expert could opine, rather than simply proffering witnesses they would like to call (i.e. one of Mitchell's experts from the *Daubert* hearing).  Mitchell finally contends that his trial counsel must have been ineffective by failing to call "his expert witnesses on reliability" because if the Court had *actually* forbid him from doing so that would have constituted reversible error under United States v. Velasquez, 64 F.3d 844 (3d Cir.

---

[23] Mitchell filed his motion for *habeas* *corpus* *pro* *se*.  But counsel (David DiPasqua, Esq.) represented him at the 2255 hearing.

1995) (holding that district court committed reversible error for refusing to admit defendant's handwriting expert).[24]  And so Mitchell argues if such an error on the Court's part would have resulted in his conviction being vacated, no less should be true for when his trial attorneys commit the very same error.

On October 19, 2005, the Court held a 2255 hearing during which Mitchell called as witnesses his trial (and _Daubert_) counsel, Lee Skipper, Esq., and Robert Epstein, Esq.[25]  Neither Skipper nor Epstein would admit that their representation was ineffective.[26]  Based on their testimony, it was also evident that they were in agreement on the following five points:

> (1) both had a clear understanding (though in the Third Circuit's view erroneous) that the Court had precluded them from calling as witnesses during trial any of the experts they presented at the _Daubert_ hearing;[27]

> (2) they sought clarification regarding this Court's September 13, 1999 ruling denying Mitchell's motion under _Daubert_ on which

---

[24] Judge Becker aptly describes _Velasquez_ as: "announc[ing] a parity principle: If one side can offer expert testimony, the other side may offer expert testimony on the same subject to undermine it, subject, as always, to offering a qualified expert with good grounds to support his criticism." _Mitchell_, 365 F.3d at 247.

[25] Mitchell neither filed a brief in support of his petition nor a reply to the Government's opposition.

[26] _See, e.g.,_ 10-19-05 Habeas Motion Tr. at 19 ln. 7-21.

[27] _See_ 10-19-05 Habeas Motion Tr. at 6 ln. 21-25 (Skipper); 35 ln. 21-22 (Epstein).

witnesses could be called at trial;[28]

(3) the experts they would have called at trial would have been limited to the ones called at the _Daubert_ hearing;[29]

(4) Mitchell's experts would have testified as to the reliability (or lack thereof) of fingerprint identification;[30] and

(5) they believed that this expert testimony would have affected the outcome of the trial.[31]

Mitchell did not testify at the hearing, and the Government did not call any rebuttal witnesses.

---

[28] _See_ 10-19-05 Habeas Motion Tr. at 7 ln. 20-25 (Skipper); 35 ln. 21-23 (Epstein).

[29] _See_ 10-19-05 Habeas Motion Tr. at 25 ln. 13-25, 26 ln. 1 (Skipper) (Q: As you sit here today, can you identify any other witness who you might have called at trial, other than those three, if you were permitted to get into this area of reliability? A: Not at this time, no, I can't. Q: In fact, if you had thought in your mind that you were permitted to call witnesses, you would have started [with your experts from the _Daubert_ hearing?] A: Most definitely. Q: And probably ended there, as well? A: Yes, certainly."); 36 ln. 4-16 (Epstein) ("[I]f I had understood that the Court was permitting us to call one of the experts [from] the _Daubert_ hearing, we would have called one of the experts from the _Daubert_ hearing. We wouldn't have sought out any additional experts.").

[30] _See_ 10-19-05 Habeas Motion Tr. at 24 ln. 21-25 (Skipper) ("[Mitchell's experts] all could have testified as to the lack of reliability in the [fingerprint] process"); 38 ln. 14-20 (Epstein) ("[Mitchell's experts] would have explained that there was no test[ing] and no rigorous testing, or no testing of any sort that really had been done in the field, no standards, no error rates had been established. Very little in the way of peer review and publication. In our view that goes to the issue of reliability".).

[31] _See_ 10-19-05 Habeas Motion Tr. at 34 ln. 9 (Skipper); 39 ln. 6-9 (Epstein).

*E. Government's Opposition*

The Government doesn't mince words and asserts flatly that Mitchell's ineffective assistance of counsel claim is baseless. <u>See</u> Government's Response to Defendant's *Habeas Corpus* Motion Under 28 U.S.C. § 2255 ("Govt. Resp.") at 1.  It argues that Mitchell's claim must fail because he has not identified any expert testimony that could challenge "the basic ability of a trained fingerprint examiner to make a comparison of known prints to latent prints." <u>Id.</u> at 15; <u>see also</u> <u>id.</u> at 16 ("[T]he defense experts did not offer the opinion Mitchell would have preferred that whether called science or something else, the method of fingerprint identification used by the FBI fails to make reliable identifications."); <u>id.</u> at 22 ("In short, the defense . . . was never able to present testimony questioning the utility or reliability of fingerprint identification.").  And so the Government believes that the basic defect in Mitchell's petition is his trial counsel cannot, as a *matter of law*, be found ineffective when he fails to identify any favorable testimony (expert or otherwise) that was then available to his counsel but which they failed to present. <u>See</u> <u>id.</u> at 25 (citing <u>Gattis v. Snyder</u>, 278 F.3d 222, 236-37 (3d Cir. 2002)).

## II. Ineffective Assistance of Counsel Standard

The Sixth Amendment guarantees criminal defendants the right to "reasonably effective" legal assistance. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  An attorney's performance is ineffective if a habeas petitioner demonstrates: (1) that "counsel's representation fell below an objective standard of reasonableness;" and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 688, 694.  Courts conventionally describe the two prongs of the <u>*Strickland*</u> test as the "performance prong" and the "prejudice prong."

The "performance prong" requires a court to assess whether counsel's representation was constitutionally deficient. The Sixth Amendment, however, does not guarantee that a defendant receives either perfect representation or that his attorney's performance is error-free.  And consistent with this understanding of the Sixth Amendment is the presumption "that counsel [was] effective" at trial. <u>United States v. Farr</u>, 297 F.3d 651, 658 (7th Cir. 2002).[32]  Thus, judicial scrutiny of whether an attorney's performance did in fact fall "below an

_____

[32]  Attorneys at trial are, of course, not the only ones a defendant may accuse of being ineffective. <u>See, e.g.,</u> <u>United States v. Sawyer</u>, 2005 U.S. Dist. LEXIS 18405 (E.D. Pa. Aug. 25, 2005) (considering an ineffective assistance of counsel claim against appellate counsel).

-16-

objective standard of reasonableness" is not exacting.

Strickland, 466 U.S. at 688; see also Affinito v. Hendricks, 366
F.3d 252, 258 (3d Cir. 2004).  In this regard, Strickland
observed:

> It is all too tempting for a defendant to
> second-guess counsel's assistance after
> conviction or adverse sentence, and it is all
> too easy for a court, examining counsel's
> defense after it has proved unsuccessful, to
> conclude that a particular act or omission of
> counsel was unreasonable. *A fair assessment*
> *of attorney performance requires that every*
> *effort be made to eliminate the distorting*
> *effects of hindsight*, to reconstruct the
> circumstances of counsel's challenged
> conduct, and to evaluate the conduct from
> counsel's perspective at the time.

Strickland, 466 U.S. at 689 (emphasis added).  That an attorney's
performance was effective therefore begins with the "strong
presumption that counsel's conduct falls within the *wide range* of
reasonable professional assistance." Id. (emphasis added);
see also Kimmelman v. Morrison, 477 U.S. 365, 383 (1986).

      If a petitioner establishes that his attorney's
performance was constitutionally deficient, the court then turns
to *Strickland*'s "prejudice prong."[33]  The "prejudice prong"
focuses exclusively on whether the outcome of the trial (or

---

[33]  When an attorney's performance is judged to be reasonably
effective within the meaning of the Sixth Amendment, a petitioner can
not argue, as a matter of law, that the attorney's performance
prejudiced the outcome of his trial (or the proceeding).

proceeding) would have been different but for the attorney's errors.  The standard for showing prejudice "is not a stringent one." Hull v. Kyler, 190 F.3d 88, 110 (3d Cir. 1999) (quoting Baker v. Barbo, 177 F.3d 149, 154 (3d Cir. 1999)).  A petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.; Lockhart v. Fretwell, 506 U.S. 364, 372 ("[T]he "prejudice" component . . . focuses on the question [of] whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.") (citations omitted).  And though this standard demands that a petitioner show more than "that the errors had some conceivable effect on the outcome of the proceeding," it does not require a showing that the error "more likely than not altered the outcome in the case." Strickland, 466 U.S. at 693; see also Hull, 190 F.3d at 110 (prejudice standard "is less demanding than the preponderance [of the evidence] standard").

### III. Discussion

*A. The nature of Mitchell's ineffectiveness claim*

It is clear from Mitchell's petition that he believes his

-18-

attorneys were ineffective because they failed to call his expert witnesses (those from the _Daubert_ hearing) at trial.  But as to what he desired from their testimony - that's a bit ambiguous. He offers that these expert witnesses would have testified "to the reliability (or lack thereof) of fingerprint identification." Petition at 5.  This could mean a number of different things.  In the Government's view, Mitchell wanted his experts to testify as to either: (1) the reliability of the FBI's method to make fingerprint identifications; or (2) more generally "the basic ability of a trained fingerprint examiner to make a comparison of known prints to latent prints." Govt. Resp. at 15, 16.[34]  The Court sees no reason, however, to read Mitchell's claim in such a limited manner.

For the Government, the upside to reading Mitchell's claim in the fashion it suggests is that it can then advance the following argument: Mitchell's claim must fail because he did not identify any expert who would testify that he "questioned the

_____

[34] See also 10-19-05 Habeas Motion Tr. at 47 ln. 2-7 ("[Mitchell] had his witnesses, and they were Dr. Stoney, Dr. [sic] Starr and Dr. Cole.  And so that's what we have to look at.  It will not carry the day to say, well, there must be other people out there who say fingerprints are unreliable.") (Argument on behalf of the Government by Assistant United States Attorney Robert Zauzmer).  The Court notes that the Government does not have a single - consistent - characterization of Mitchell's proposed expert testimony.

general reliability of the identification methods employed."[35]
Id. at 25.  This is a classic strawman argument, however; it
defeats a position Mitchell never took.  The Government's myopic
reading of Mitchell's claim might be plausible if the Court were
to ignore that a _Daubert_ hearing was ever held.

     At the heart of evaluating whether an expert's proposed
testimony is admissible under _Daubert_ is a determination as to
its _reliability_.  See Mitchell, 365 F.3d at 234 ("_Daubert_
identified the twin concerns of 'reliability' (also described as
'good grounds') and 'helpfulness' . . . as the 'requirements
embodied by Rule 702.'") (citing Daubert, 509 U.S. at 589-92).[36]
The Third Circuit has identified the following factors as
addressing the issue of reliability:

> (1) whether a method consists of a testable
> hypothesis; (2) whether the method has been
> subject to peer review; (3) the known or
> potential rate of error; (4) the existence
> and maintenance of standards controlling the
> technique's operation; (5) whether the method
> is generally accepted; (6) the relationship

---

[35]  It is unclear if the Government here is referring solely to
the FBI's methods of identification or is broadly including the
methods (if different) that the state forensic labs used to effectuate
a match in this case.  See also 10-19-05 Habeas Motion Tr. at 46 ln.
14-23, 47 ln. 2-7 (Argument on behalf of the Government by Assistant
United States Attorney Robert Zauzmer).

[36]  To be clear: under _Daubert_, a court is evaluating whether _the
methods or techniques_ relied upon by an expert in reaching her
conclusions were in fact reliable.  It makes little sense to ask
whether the proposed testimony itself is "reliable."

> of the technique to methods which have been
> established to be reliable; (7) the
> qualifications of the expert witness
> testifying based on the methodology; and (8)
> the non-judicial uses to which the method has
> been put.

In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir.
1994) (*Paoli II*).

Testimony and evidence that relates to these factors, i.e. to the
reliability of a method or process, are no less relevant at trial
than during the *Daubert* hearing.  And so this is the type of
testimony Mitchell wished to put before the jury.[37]  The only
remaining question is whether his *Daubert* experts could in fact
testify about issues relating to the general reliability of
fingerprint identification.  The answer – yes.  Each of
Mitchell's experts were called to testify as to whether the
conclusion that a latent fingerprint came from a particular
person is a scientific determination.  But stripped of that last
aspect (the scientific part), the factors that would go into
reaching such a conclusion overlap with those that touch upon the
general reliability of a process or procedure.[38]

        The Court therefore believes that Mitchell's claim is

---

     [37] This makes sense after all – if the Government has an
*opportunity* to present expert testimony touting the robustness and
reliability of a process, so to must the defendant. See, e.g., United
States v. Velasquez, 64 F.3d 844 (3d Cir. 1995).

     [38] See *infra* Part III-B-2.

better understood as seeking to introduce expert testimony that
would _raise_ _questions_ as to the general reliability of
fingerprint identification (rather than any specific
identification protocols).[39]  And so contrary to the Government's
suggestion, Mitchell certainly has experts who could offer such
(relevant) testimony.

B. _Application of Strickland_

    1. _Performance Prong_

        Mitchell's claim is in one sense quite ordinary.  _Habeas_
petitioners routinely allege that their trial attorneys were
ineffective because they failed to call a particular expert.
Having examined the case law, the Court believes that "failure to
call an expert" claims can be roughly generalized as falling into
one of two categories.  One category encompasses those situations
in which an attorney's performance is found constitutionally
deficient because he failed to make a proper investigation.  In

---

[39]  Although Mitchell's claim is phrased broadly enough that it
could also encompass testimony that would challenge the specific
identification made in this case, it is unlikely that he wanted to
call his _Daubert_ experts for that purpose.  As an initial matter, none
of them had looked at the latent prints at issue in this case, let
alone attempted to make a comparison between the latent prints and
Mitchell's ten-print.  One of them (Dr. Cole) had also never made a
comparison , while another (Prof. Starrs) admitted to having no formal
training in performing fingerprint comparisons.  Based on the record
from the _Daubert_ hearing, it is highly doubtful that these three
experts would have been able to offer any uniquely helpful testimony
about the specific identification made in this case.

those cases, the attorney's deficient performance is typified by his failure to consult with the necessary (or appropriate) expert in preparing a defense.[40]   Nonetheless, an attorney's performance is never *per se* constitutionally deficient for failing to call an expert as a result of an incomplete (or inadequate) investigation. See Roe v. Flores-Ortega, 528 U.S. 470, 481 (2003) ("[W]e have consistently declined to impose mechanical rules on counsel -- even when those rules might lead to better representation . . . .").

The second category covers those cases in which counsel makes an informed decision not to call an expert (who often is available) at trial.  But unlike the first category of cases, courts seldom find an attorney's performance to be

---

[40]   See, e.g., Dugas v. Coplan, 428 F.3d 317, 329-30 (1st Cir. 2005) (finding counsel's performance to be deficient when he lacks specialized knowledge about arson investigations and fails to consult with an expert on such investigations when arson is the "cornerstone of the state's case"); Miller v. Anderson, 255 F.3d 455, 459 (7th Cir. 2001) (finding "no excuse for the lawyer's failure to consult experts on hair, DNA, treadmarks, and footprints" when such factors are critical to defense's argument that defendant was not at the scene of the crime) (Posner, J.), remand order modified by stipulation, 268 F.3d 485 (7th Cir. 2001); Troedel v. Wainwright, 677 F. Supp. 1456, 1461 (S.D. Fla. 1986) (finding counsel's performance deficient where counsel "neither deposed . . . the state's expert witness [on gunpowder residue], nor bothered to consult with an expert in the field prior to trial" despite the fact that counsel "knew pretrial this issue would be critical"), *aff'd*, 828 F.2d 670 (11th Cir. 1987).

constitutionally deficient for making such a decision.[41]  This
reluctance to second guess an attorney's affirmative decision not
to call an expert (or any given witness) reflects the
understanding that such a decision is fundamentally a "strategic
choice[] made after [a] thorough investigation of [the relevant]
law and facts." Strickland, 466 U.S. at 690.  Indeed, electing
not to call a witness is "a tactical decision of the sort engaged
in by defense attorneys in almost every trial" United States v.
Nersesian, 824 F.2d 1294, 1321 (2d Cir.), cert. denied, 484 U.S.
957 (1987).

    The important point is that a court must look beyond the
mere fact that the attorney did not call a particular expert.
Rather, it is necessary to consider why the attorney failed to do
so.  Indeed, it is the "why" which distinguishes these sets of
cases.

    The problem with Mitchell's claim is that it doesn't

---

    [41]  See, e.g., Huffington v. Nuth, 140 F.3d 572, 582 (4th Cir.
1998) (decision to not call ballistics expert a reasonable strategic
decision in light of defense's trial strategy of asserting that
defendant was not even present during the commission of the crimes);
United States v. Kirsh, 54 F.3d 1062, 1072 (2d Cir. 1995) (counsel's
decision to not call fingerprint expert to discuss possibility of
fingerprint forgery "was plainly a tactical decision and hardly
bespeaks of professional incompetence"); United States v. McGill, 11
F.3d 223, 227-28 (1st Cir. 1993) (approving counsel's decision to not
call an easily impeachable firearms expert as a reasonable tactical
decision when the "information sought from the witness had already
been introduced from another expert," even if on cross examination).

quite fit into either of the above categories.  His principal
trial strategy was to attack the latent fingerprint evidence
linking him to the getaway car.  And he did so in three ways: (1)
by arguing that any expert testimony about fingerprint
identification was inadmissible under _Daubert_; (2) by challenging
the general reliability of fingerprint identification; and (3) by
challenging the specific identification made in this case.
Electing to focus primarily on undermining the fingerprint
evidence, however, meant obtaining the assistance (if not the
testimony) of experts in the area of fingerprint identification
(or more broadly forensic science).  And Mitchell's trial
attorneys did exactly that.

        During the _Daubert_ hearing, they called three expert
witnesses to testify that fingerprint identification lacked a
scientific basis, and therefore any expert testimony on the
subject should be inadmissible under Fed. R. Evid. 702.[42]  At
trial, Mitchell's attorneys called every fingerprint examiner who

---

[42]  The Third Circuit rejected that as the proper threshold for
admissibility under Fed R. Evid. 702. _See_ _Mitchell_, 365 F.3d at 244-45
("To the extent that Mitchell's attack rests on his experts' claim
that latent fingerprint examiners do not engage in 'science,' he does
not heed the text of _Rule 702_ or the Supreme Court's teachings in
[_Kuhmo Tire v. Carmichael_, 526 U.S. 137 (1999)] . . . Mitchell seeks a
significantly higher threshold of admissibility under _Rule 702_, and,
consequently, a very different allocation of responsibility between
judge and jury.").

initially was unable to match one or both of the latent prints to Mitchell.[43]  And finally, a review of the record reveals that Mitchell's attorneys were well-versed in the nomenclature, history, techniques, methods and processes associated with fingerprint identification that allowed them to conduct an effective (and thorough) cross examination of the Government's experts.[44]  In short, his trial attorneys' performance was not constitutionally deficient from a lack of preparation (i.e. failing to consult with the proper experts) or investigation.

Their performance was not error free, however; and the miscue of not calling Mitchell's _Daubert_ experts is indeed a glaring one.  And that decision is, of course, the basis for Mitchell's ineffective assistance of counsel claim.

The Court noted above that an attorney's decision to call (or not to call) a particular expert is afforded a generous level of deference when reviewed in the context of a _Strickland_ claim.  Courts have rationalized this deference by declaring that an

---

[43]  Each of these examiners was qualified as an expert in latent fingerprint identification. _See supra_ text accompanying Note 21.

[44]  _See, e.g.,_ 2-2-00 Tr. at 112 ln. 6-9 (defense cross examination of Agent Meagher about certification); _id._ at pp. 113-116 (defense cross examination of Agent Meagher about difficulties of doing ten-print comparisons versus latent print comparisons); _id._ at 116 ln. 23-23 (using appropriate technical terms 'whorl' and 'arch' during cross examination of Agent Meagher); _id._ at 152 ln. 13-16 (using appropriate technical term "level two detail" during cross examination of Agent Meagher).

attorney must have had a tactical (or strategic) reason for not calling a particular witness.  This case doesn't present that situation, however.  There was no good tactical reason to keep Mitchell's _Daubert_ experts away from the jury - a fact that Mitchell's trial attorneys readily acknowledge.  Indeed, they claim that they wanted to call the _Daubert_ experts at trial, but failed to do so because they clearly understood this Court to have precluded their testimony.[45]  Mitchell's claim therefore raises the novel question: Was the performance of his attorneys constitutionally deficient because they failed to call his _Daubert_ experts at trial as a result of an incorrect, but allegedly sincere understanding that the Court had precluded them from doing so?[46]

On appeal, the Third Circuit rejected Mitchell's challenge that this Court had precluded his _Daubert_ expert witnesses from testifying at trial despite the "less than pellucid" nature of the colloquies on the matter.  Id. at 219; see also id. at 246-51.  Given this observation, there perhaps is

---

[45] See, e.g., 10-19-05 Habeas Motion Tr. at 36 ln. 4-16 (Epstein).

[46]  Stated more generally, the question becomes: Is the performance of an attorney constitutionally defective because he or she fails to call an expert witness as a result of an incorrect, but sincere understanding that a court had precluded him or her from doing so?

a basis for Mitchell's attorneys' to claim that they _didn't_ clearly understand the Court's ruling on the matter.  But that wasn't their position at the 2255 hearing.[47]  Rather, they asserted unambiguously that they _clearly_ understood the Court's ruling; and it meant the Court was not allowing Mitchell's _Daubert_ experts to testify about the general reliability (or lack thereof) of fingerprint identification.[48]  The Court is frankly somewhat incredulous of this assertion as it finds it unsupported by the record.

On the same day the Court denied Mitchell's _Daubert_ motion, it also made some initial comments about the ability of Mitchell's _Daubert_ experts to testify at trial.  And candidly the record reflects that the Court's comments were not a model of clarity, if not in fact arguably somewhat inconsistent.[49]  But

---

[47]  If Mitchell's attorneys had testified that at the start of the second trial they were still _unclear_ on whether the Court would allow Mitchell's _Daubert_ experts to testify, then the Court would have concluded that their performance was constitutionally deficient.  This is not to say that an attorney's failure to get clarification before proceeding always amounts to constitutionally deficient performance. But in the context of this case, in which the defense's strategy depended significantly on the presentation of testimony from Mitchell's _Daubert_ experts, it would have been incumbent upon his trial attorneys not to proceed until they had an absolutely clear understanding of where the Court stood.

[48]  See _supra_ Note 27.

[49]  Compare 9-13-99 _Daubert_ Ruling Tr. at 4 ln. 8-20 with _id._ at 7 ln. 10-12.

that would not be the Court's last thoughts on the matter.
Because as it turned out, Mitchell's counsel needed clarification
regarding whether they could call Mitchell's *Daubert* experts at
trial.  That request for clarification took place on the first
day of trial (just before the jury *voir dire* and more than four
months after the Court had ruled on Mitchell's *Daubert* motion).
Since Mitchell's attorneys had not filed a formal motion seeking
clarification, the Court was not fully prepared to address their
question.[50]  After having an opportunity to review its earlier
"ruling" and hear argument from both the Government and
Mitchell's attorneys, this Court ultimately ruled:

> That the Court ruled [that testimony about
> whether fingerprint identification is
> scientific was not admissible]. That's fine,
> that's complete. But, in that regard, though,
> if you have a latent fingerprint expert who
> will testify, an expert or a person in latent
> fingerprints can't make a positive
> identification with 10 points, 15 points, 40
> points, then you are permitted to--you can
> call that expert to testify, it doesn't have
> to do with just his particular points, that
> one can find but in general, ***if you have an
> expert, a latent fingerprint expert that can
> testify that a person cannot, a person in the
> field, an expert in the field cannot make an
> identification, whether it is Mr. Mitchell's
> fingerprints or anyone else's fingerprints,***
> based on 10, 20, 15, ***you are permitted to***

---

[50] See 1-31-00 Tr. at 4 ln 10-11 ("What's that in reference to, what ruling?") (The Court); id. at 7 ("I don't have [the relevant transcript] before me.") (The Court).

***call that expert.***[51]

     With due respect to the Third Circuit, the Court believes at this point it had now made it clear to Mitchell that he was not precluded from calling expert witnesses to testify about the general reliability (or lack thereof) of fingerprint identification.  In mentioning "point comparisons," the Court was merely providing an *example*[52] of the type of testimony that Mitchell could present through his experts.  And although Mitchell's attorney initially responded that he had "[n]o one to present the testimony as . . . outlined"[53] by the Court, he almost immediately backtracked and offered, "There would, yes, sir, there would be Dr. Stoney's testimony, that there is – it is of questionable reliability because there's no testing done in the field."[54]  To which the Court responded, "Whether or not you call him in reference to latent fingerprint identification *is your call*."[55]  He replied, "Right. That would be similar to the

_____

[51] 1-31-00 Tr. at 11 ln 8-22 (emphasis added).

[52]  That this was just an example is made apparent by the fact that the Court (*I*) used random numbers that were neither in numerical order nor consistent.

[53] 1-31-00 Tr. at 12 ln 6-7.

[54] 1-31-00 Tr. at 12 ln 12-15.

[55] 1-31-00 Tr. at 12 ln 19-20 (emphasis added).

other two people that *I would call*."[56]  And the Court asked, "The other individuals that testified at the *Daubert* hearing?"[57]  Mitchell's counsel said, "Yes."  And that was the end of the discussion about Mitchell's *Daubert* experts.  What is unmistakably clear from that final exchange is that the Court did not make an *explicit* ruling precluding any of Mitchell's experts from testifying at trial.

The Court is at a loss to explain how Mitchell's attorneys could *clearly* believe that they were precluded from calling his *Daubert* experts.  And based on questions they asked during the trial, the Court has little reason to accept their explanation.

For example, through at least five witnesses, Mitchell's attorneys elicited testimony about the general reliability (or lack thereof) of fingerprint identification.[58]  Indeed, in overruling a Government objection, the Court permitted his attorneys to ask questions about probability studies and error rates that went to the "totality of the reliability of the

---

[56] 1-31-00 Tr. at 12 ln 21-22 (emphasis added).

[57] 1-31-00 Tr. at 13 ln 1-2.

[58] See *infra* Part III-B-2.

examination performed by this witness."[59]  And they also raised
issues relating to the lack of general reliability during closing
arguments.[60]  That Mitchell's attorneys asked and argued about
the general reliability of fingerprint identification belies
their assertion that they clearly understood the Court to
preclude Mitchell's _Daubert_ experts from testifying about these
issues.

This leaves the Court with one of two options - either of
which results in it concluding that Mitchell's attorneys'
performance was constitutionally deficient for failing to call
his _Daubert_ experts.  If the Court credits their claim that they
"clearly understood" its ruling _on the first day of trial_ to
preclude them from calling Mitchell's expert witness, the Court
concludes that this type of error is similar in kind to
proceeding with a misunderstanding of the applicable law.  And in
certain cases, courts have held that such an error suffices for

---

[59] 2-2-00 Tr. at 120 ln. 5-7; see also id. at pp. 124-31.  The
Court acknowledges that this statement may be a bit ambiguous as to
whether the witness (Agent Meagher) could testify only about studies
that were performed regarding the specific identification he made in
this case or those that dealt with fingerprint identification more
generally.  What is clear from the questions and answers following the
Court's ruling, is that the Court did not limit Mitchell's attorney to
just studies involving the specific identification in this case.

[60] See _infra_ Note 81.

finding constitutionally deficient performance.[61]   The Court

reads these cases as standing for the proposition that certain

errors are of such a magnitude that they significantly disrupt

the defense's intended strategy.  This disruption can generally

occur in one of two ways.  In the first, the defendant did not

have an opportunity to present the defense he intended because

the attorney's legal error led him to believe incorrectly that he

could not introduce certain evidence or testimony at trial.  The

other situation presents the reverse case; here the attorney was

legally incorrect in believing that he could introduce certain

evidence but in fact was not allowed to under a correct

understanding of the law.

     If the Court credits Mitchell's attorneys' explanation

for their failure to call his _Daubert experts_, it concludes that

this error was of a sufficient magnitude to disrupt a principal

aspect of his defense strategy.  It is not seriously questioned

---

[61] See, e.g., Frierson v. Woodford, 463 F.3d 982, 994-95 (9th Cir.
2006) (finding counsel ineffective for grievous misunderstanding of
whether a witness could properly invoke the Fifth Amendment); Dando v.
Yukins, 461 F.3d 791, 799 (2d Cir. 2006) (finding counsel's
performance constitutionally deficient for failing to seek a mental
health expert because of his misunderstanding of the law regarding the
availability of such experts); Greiner v. Wells, 417 F.3d 305, 325 (2d
Cir. 2005) (noting that courts have found deficient performance where
counsel's conduct resulted "from a legal error or a misunderstanding
of the law") (citing Terry Williams v. Taylor, 529 U.S. 362, 395
(2000);  DeLuca v. Lord, 77 F.3d 578, 587 (2d Cir. 1996); United
States v. Hansel, 70 F.3d 6, 8 (2d Cir. 1995) (per curiam)).

that a central focus of Mitchell's strategy was to create reasonable doubt as to the reliability of the specific identification by attempting to illustrate that the general reliability of fingerprint identification was questionable.  And his attorneys' "clear misunderstanding" obviously inhibited Mitchell's ability to mount such a defense.

As the Court has indicated, however, it questions whether Mitchell's attorneys "clearly understood" the ruling in the manner they suggest.  Thus implying that Mitchell's attorneys understood they could call his _Daubert_ experts but simply chose not to.  And ordinarily the Court would not carefully scrutinize their decision to call (or not call) a witness,[62] but here there was manifestly no tactical or strategic reason for not attempting to call _any_ of Mitchell's _Daubert_ experts.  And Mitchell's attorneys admitted as much during the 2255 hearing.[63]  Because these witnesses were Mitchell's primary way of challenging the general reliability (or lack thereof) of fingerprint identification, and this challenge was a central strategy of his defense, the Court holds that his trial attorneys' performance was constitutionally deficient for failing to do so (or even

---

[62] See _supra_ Note 41.

[63] See _supra_ Notes 30 and 31.

attempting to try).[64]

*2. Prejudice Prong*

Having concluded that the performance of Mitchell's attorneys was constitutionally deficient because of their failure to call (or attempt to call) his <u>Daubert</u> experts, the question now is whether this error prejudiced Mitchell.  The Court holds that it did not.

To show prejudice, Mitchell needed to demonstrate that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.  He has failed to make this showing, however, because his trial attorneys' error does not undermine the Court's confidence in the outcome of his

---

[64] Mitchell also alleged that his attorneys were ineffective by failing to inquire whether his expert witnesses could testify as to certain subject areas, rather than inquiring whether a particular witness could testify.  To support his position, he notes that the Third Circuit found that his attorneys' choice to frame the issue of admissibility in the terms of the witness, rather than by their proposed testimony may be convenient, but can lead to confusion and make applying the law difficult. See <u>Mitchell</u>, 365 F.3d at 250.  The Third Circuit then hints that it may have been preferable for Mitchell's counsel to have proffered the subject matter of testimony they wanted to present, rather than proffer the witnesses they wished to call. See <u>id.</u> at 251.  This Court concludes that, as a matter of law, the decision by Mitchell's attorneys to discuss the admissibility of defense experts on a witness-by-witness basis, rather than by subject area, does not rise to the level of constitutionally deficient performance.  It was entirely reasonable for Mitchell's attorneys to frame the issue in this matter given that it was consistent with the Court's approach.

trial.  _See_ _id_.  When viewed against the testimony and evidence
presented at trial, the Court is not persuaded that additional
testimony from Mitchell's _Daubert_ experts about the general
reliability of fingerprint identification would have altered the
verdict.[65]  This is for two reasons: (1) his attorneys were able
to elicit testimony _helpful_ to Mitchell's contention that the
general reliability of fingerprint identifications is
questionable; and (2) his _Daubert_ experts could offer no
testimony that would undermine the specific identification made
by the Government matching the latent prints found in the getaway
car to Mitchell.

Mitchell's _Daubert_ experts plainly could have detailed
why certain aspects of the field of fingerprint identification
raise doubts about its general reliability as a method of
effectuating accurate matches (and identifications).  Their
testimony would have likely highlighted that those aspects
include:[66] (1) the fact that there is no known error rate for
fingerprint identification;[67] (2) that there has been little or

_____

[65] _See_ Chappee v. Vose, 843 F.2d 25, 33 n.6 (1st Cir. 1988) ("[W]e
note in passing that prejudice cannot be presumed merely from a
lawyer's eschewal of available expert witness testimony.") (citation
omitted).

[66] _See_ 10-19-05 Habeas Motion Tr. at 38 ln. 13-20 (Epstein).

[67] There are two possible error rates: one for false positives
(making an incorrect affirmative match), and one for false negatives

no peer review assessing fingerprint identification processes;
(3) that there are no uniform standards with respect to training,
certification and qualifications of fingerprint examiners; and
(4) most importantly the standard for concluding that there is a
match (or identification) varies between jurisdictions.[68]  But
there's a catch.  Mitchell's _Daubert_ experts were not the only
ones who could testify about the purported shortcomings of
fingerprint identification.  There were several other witnesses
that could (and _did_) testify in substance about the very same
issues Mitchell's _Daubert_ experts would have.  And his trial
attorneys were effective at eliciting this testimony from defense
and Government fingerprint experts alike.

        Mitchell first raised the above issues during his cross
examination of Agent Meagher, one of the Government's two
fingerprint experts.  Agent Meagher readily acknowledged that he
knew of no completed studies that reported either the probability
of two people having fingerprints with the same number of
characteristics in common[69] or what the error rate was for

_____

(failing to make a correct affirmative match).

        [68] In other words, there is no single, universally agreed upon
standard for determining whether a particular latent print positively
matches the fingerprints of a given individual.

        [69] See _supra_ Note 9.

-37-

fingerprint examiners.[70]  And not only were there no studies on

the error rate of false identifications,[71] but Agent Meagher

admitted that he knew of "nobody that tallies [the number of

identification mistakes] and counts it for reporting purposes."[72]

In essence, he admitted if fingerprint examiners make mistakes -

there was no way of knowing the number - let alone whether these

mistakes resulted in a false positive or a false negative.  He

also agreed that the training and qualifications for becoming a

fingerprint examiner varied between jurisdictions.[73]  And

ultimately, Agent Meagher conceded that the fingerprint

comparison process was largely "subjective."[74]  This last

---

[70] See 2-2-00 Tr. at pp. 130-31 (probability studies); id. at pp.
131-33 (error rates); see also id. at pp. 191-92 (reiterating on re-
direct that he "knew of no entity that tracks and reports the
frequency of . . . practitioner error rate[s]")

[71] The Court notes that neither Mitchell's attorney nor Agent
Meagher differentiated between the error rate for false positives and
false negatives.

[72] 2-2-00 Tr. at 133 ln. 24-25.

[73] See 2-2-00 Tr. at 150 ln. 20-25.

[74] See 2-2-00 Tr. at 151 ln. 5-19.  When cross-examined the next
day, Agent Meagher attempted to explain that the steps a fingerprint
examiner follows are objective (i.e. each examiner follows the same
basic analytical process), but how a particular examiner decides he
has a match might vary among examiners (i.e. what conclusions he draws
from that process is subjective). See 2-4-00 Tr. at pp. 57-59.  While
this later testimony is more nuanced, the fact remains that the jury
heard Agent Meagher testify several times that the _overall_ process is
subjective.  And so the Court believes that despite this testimony,
Mitchell's attorneys were still able to effectively highlight that the
fingerprint identification process has a significant subjective

-38-

admission was especially significant because a central theme of
Mitchell's defense was to equate questionable reliability with
the lack of objective standards for making a match.

Agent Meagher testified more extensively than any other
witness about issues relating to the general reliability of
fingerprint identification.  But notably the testimony from other
witnesses on these issues was remarkably consistent.  For
example, Agent Johnson, the Government's other fingerprint
expert, agreed (under cross examination) with Agent Meagher that
a fingerprint comparison is (at least in part) a subjective
exercise because the training, education, experience and approach
varies among 'qualified' examiners.[75]  He went further, however,
and testified that there was also no uniform standard for what
constitutes a "match."[76]  Some jurisdictions employ a
quantitative point system (like Maine), while others (like the
FBI) rely upon a more qualitative approach.[77]  Fingerprint

_____

component.

[75] See 2-3-00 Tr. at pp. 35-36.  Another aspect of fingerprint
identification lacking standardization is in its nomenclature.  See id.
at 38 ln. 11-19. (noting at least three different terms are used to
denote attributes that are matching between a latent and known
fingerprint).

[76] See 2-3-00 Tr. at pp. 47-48.

[77] See, e.g., 2-3-00 Tr. at pp. 48-49 (FBI's qualitative approach
to matching); id. at pp. 148-51 (Maine employed a 10-point standard in
1999). See also supra Note 9.

examiners called by the defense concurred on several of these points - that the process is (at least in part) subjective because of differences in experience and training,[78] and that there is no single standard for concluding that an examiner has a "match."[79]

The jury therefore heard five _fingerprint experts_[80] testify that the field of fingerprint identification "suffered" from a lack of a known error rates, subjectivity in the identification process and a general lack of standards with respect to training, education and when an examiner has a "match."  And Mitchell's counsel did not fail to emphasize the significance of these points during closing arguments.[81]  So in substance the jury heard testimony that did not differ materially from that which Mitchell's _Daubert_ experts could have offered.[82]

_____

[78] See, e.g., 2-3-00 Tr. at 188 ln. 10-19 (Testimony of Michael McSparrin, Department of Public Safety, State of Mississippi).

[79] See, e.g., 2-4-00 Tr. at pp. 37-38. (Testimony of Raymond York, Department of Law Enforcement, Idaho State Police).

[80] The Court finds that defense counsel elicited testimony about the general reliability (or lack thereof) of fingerprint identification from the following witnesses: Agents Meagher and Johnson, Michael McSparrin, Raymond York and John Otis.

[81] See 2-4-00 Tr. at 149 ln. 2-9; id. at 160 ln. 13-17; id. at pp. 166-67.

[82] See, e.g., 7-12-99 Daubert Tr. at pp. 88-89 (Dr. Stoney describing fingerprint comparison as lacking an objective standard); id. at pp. 96-98; p. 244 ln. 13-25 (Dr. Stoney noting that the

To this point, the Court has treated Mitchell's challenge to the specific identification made in this case as distinct from his broader assault on the general reliability of fingerprint identification.  But this distinction is somewhat artificial.  There is no obvious reason to treat an attack on a specific identification as anything less than another way of challenging the general reliability of fingerprint identification.[83]  One could simply view it as a specific *example* illustrating many of the aspects that raises questions (in Mitchell's view) as to the general reliability of fingerprint identification.  Using this identification, Mitchell's attorneys highlighted: (1) that there was no uniform standard across jurisdictions (that received the FBI survey) for what constitutes a "match; (2) a lack of

comparison and evaluation process is subjective and decision might vary based on an examiner's training and experience); id. at pp. 101-05 (Dr. Stoney discussing error rates generally); id. at 237 ln. 11-15 (Dr. Stoney acknowledging the lack of peer review); id. at 160 ln. 17-19 (Prof. Starrs noting lack of uniform terminology in the fingerprint community); id. at pp. 160-62 (Prof. Starrs discussing the lack of standards for determining when an examiner has a match); id. at p. 165 (Prof. Starrs discussing the lack of training standards for fingerprint examiners).

[83]  The Court fully recognizes that simply illustrating that this (or any) match was faulty does not necessarily impugn the entire field of fingerprint identification.  The point the Court is trying to illustrate (in the main text) is that Mitchell's attorneys used aspects unique to this specific identification (in particular the FBI's survey) to tease out for the jury those aspects (e.g., lack of standards) that go to undermining the general reliability of fingerprint identification.

uniformity with respect to the training each fingerprint examiner received; and (3) most significantly, that nine jurisdictions initially had been unable to make a positive match as to one or both of the latent prints.

Finally, Mitchell's *Daubert* experts could not directly undermine the specific identification made by the FBI (and verified by virtually every examiner who received their survey) that matched the latent fingerprints found in the beige getaway car to Mitchell.  First (as the Court noted earlier), none of his *Daubert* experts were asked to perform an identification or verification in this case.  Second, they could provide no testimony or evidence suggesting that the methods or processes (both in lifting the latent prints and during the ACE-V process) used by the FBI were improperly performed.  And perhaps most importantly, they could provide no evidence that any comparison and match performed in this case resulted in a false positive (i.e. neither the FBI nor any of the jurisdictions surveyed made an incorrect affirmative match - that is, matched the latent prints to someone other than Mitchell).

In sum, the Court concludes that Mitchell did not suffer prejudice as a result of his trial attorneys' error.  The trial record reflects that he was able to present evidence about the

general reliability (or lack thereof) of fingerprint identification that in substance did not materially differ from what his *Daubert* experts would have reasonably testified to. That coupled with the fact that these same experts could offer no evidence refuting the specific identification made in this case leaves the Court confident in the jury's verdict.

### IV. Certificate of Appealability

Finally, the Court must determine whether a certificate of appealability ("CoA") should issue. See Third Circuit Local Appellate Rule 22.2.  A certificate of appealability is appropriate only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  The petitioner must "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).  The Court concludes that reasonable jurists could find its resolution of Mitchell's *Strickland* claim debatable or wrong.  Mitchell's claim raised a novel question under *Strickland* that had not been previously addressed.  And so the Court is convinced that the "issue[] presented [was] adequate to deserve encouragement to proceed further." Slack, 529 U.S. at 484 (citation and quotation marks omitted).  Accordingly, the

-43-

Court will grant Mitchell a CoA with respect to his ineffective assistance of counsel claim.

## V. Conclusion

For the foregoing reasons, the Court concludes that the performance of Mitchell's counsel was constitutionally deficient for failing to call (or attempting to call) his expert witnesses at trial, but that Mitchell did not suffer prejudice from this error because he has failed to establish that there is a reasonable probability that the jury's verdict would have been different if not for this error.  In other words, the Court's confidence in the verdict is not undermined by his trial attorneys' failure to put on the additional expert witnesses to testify as to the various factors that might raise questions as to the general reliability of fingerprint identification.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| United States of America, | : CIVIL ACTION |
| | : |
| | : 05-cv-823 |
| | : 96-cr-407-1 |
| v. | : |
| | : |
| Byron Mitchell | : |

## ORDER

AND NOW, this 21st day of May, 2007, it is hereby **ORDERED**:

1. Petitioner Byron Mitchell's 28 U.S.C. § 2255 Motion for *Habeas Corpus* is **DENIED**.

2. Petitioner Byron Mitchell is **GRANTED** a Certificate of Appealability with respect to his claim of ineffective assistance of counsel under Strickland v. Washington, 469 U.S. 668 (1984).

3. That the Clerk of Court is to **CLOSE** this matter.

BY THE COURT:

s/J. Curtis Joyner
J. CURTIS JOYNER, J.